Filed 9/14/22  In re O.E. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re O.E., a Person Coming Under the Juvenile Court Law. | B314713<br><br>(Los Angeles County Super. Ct. No. DK23763) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KIMBERLY M. et al.,<br><br>Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Susan Ser, Judge; Steven Ipson, Juvenile Court Referee. Reversed with directions.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant Kimberly M.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant Orlando E.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————————

## INTRODUCTION

Kimberly M. and Orlando E., mother and father of five-year-old O.E., appeal from the juvenile court's orders terminating their parental rights under Welfare and Institutions Code section 366.26.[1]  They contend the court erred in ruling the parental-benefit exception to adoption in section 366.26, subdivision (C)(1)(b)(i), did not apply.  They also contend the Los Angeles County Department of Children and Family Services failed to comply with the inquiry requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related California law.

Because the juvenile court did not follow the analysis the Supreme Court prescribed in *In re Caden C.* (2021) 11 Cal.5th 614 for determining whether the parental-benefit exception applies, we agree with Kimberly and Orlando the court erred in ruling it did not apply.  We also agree with Kimberly, Orlando, and the Department that neither the Department nor the juvenile court complied with ICWA's inquiry requirements.

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

2

Therefore, we reverse the orders terminating parental rights, remand for a new hearing under section 366.26, and direct the juvenile court to ensure the Department complies fully with the inquiry and, if necessary, notice provisions of ICWA and related California law.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *The Juvenile Court Sustains a Petition Under Section 300 and Removes O.E.*

In August 2017, when O.E. was not quite two months old, the Department detained him from Kimberly and Orlando and filed a petition asserting juvenile court jurisdiction under section 300, subdivision (b)(1). The Department alleged O.E. was at substantial risk of serious physical harm as a result of, among other things, his positive toxicology screen for marijuana after his birth, Kimberly's history of substance abuse, her current use of marijuana that rendered her incapable of providing regular care and supervision of O.E., Orlando's history of illicit drug use, and Orlando's current use of amphetamine and methamphetamine that rendered him, too, incapable of providing regular care and supervision of O.E.

At the detention hearing, the juvenile court found the Department made a prima facie showing O.E. was a person described by section 300 and ordered him to remain detained. The court ordered monitored visits for Kimberly and Orlando with O.E. a minimum of three times a week for three hours each visit. The court also ordered weekly random and on-demand drug testing for Kimberly and Orlando.

3

In a jurisdiction and disposition report filed in September 2017, the Department indicated that since the detention hearing Kimberly had missed two drug tests and on one occasion tested positive for amphetamine, methamphetamine, and cannabinoids. Orlando had also missed two drug tests. The Department stated that on September 21, 2017 Kimberly and Orlando reported they "had weekly monitored visits with [O.E.] . . . each Tuesday, Thursday, and Friday from 9am to 12pm."

In October 2017 the juvenile court held a combined jurisdiction and disposition hearing. The court sustained all allegations in the petition, found O.E. came within its jurisdiction under section 300, subdivision (b)(1), declared him a dependent child of the court, and removed him from Kimberly and Orlando. The court ordered reunification services for both parents that included a drug and alcohol program and continued weekly drug testing. The court also ordered that both parents could have monitored visits with O.E. three times a week for three hours each visit.

B.	*The Juvenile Court Returns O.E. to Kimberly*

For the six-month review hearing in April 2018, the Department reported that Kimberly and Orlando had monitored visits with O.E. three days a week for three hours each visit, that both parents were consistent with their visitation, and that the visits were "going well." At the hearing, the juvenile court found that Kimberly and Orlando were in partial compliance with their case plans and that returning O.E. to his parents' physical custody would create a substantial risk of detriment to his safety, protection, or physical or emotional well-being. The court ordered family reunification services to continue.

4

For the 12-month review hearing in October 2018, the Department reported that Kimberly was "progressing well with her Court ordered services," including her drug treatment program, and that on September 1, 2018 the Department had liberalized her visits with O.E. so that they were unmonitored and occurred an additional day each week. Orlando had monitored visits two days a week for three hours each visit. At the hearing the juvenile court found that Kimberly's compliance with her case plan was "substantial, but not absolutely complete," that Orlando's was "partial," and that returning O.E. to his parents' physical custody would create a substantial risk of detriment to his safety, protection, or physical or emotional well-being. The court ordered family reunification services to continue for both parents and granted the Department discretion to liberalize both parents' visits with O.E., as well as discretion to return O.E. to either parent.

For the 18-month review hearing in April 2019, the Department reported that Kimberly was living in a sober living home where she had "had six unmonitored overnight weekend visits with" O.E., which went well. The Department stated that Kimberly "demonstrate[d] the parenting skills she [had] learned effectively" and that O.E. appeared "to have a healthy attachment" to her. The Department recommended placing O.E. with Kimberly at the sober living home and providing her family preservation services. The Department recommended against returning O.E. to Orlando because, though Orlando was visiting O.E. consistently, he had only partially complied with his case plan. At the hearing the juvenile court returned O.E. to

Kimberly and ordered family maintenance services for Kimberly and enhancement services for Orlando.[2]

C. *The Department Files a Supplemental Petition Under Section 387, and the Juvenile Court Detains O.E. from Kimberly*

For a section 364 review hearing in October 2019, the Department reported Kimberly had "struggled with her sobriety and relapsed twice," testing positive for methamphetamine in May and June 2019. Kimberly admitted she had "'used' again" and stated, "I just wanted to numb myself because I have been having some problems with [O.E.'s] dad." Kimberly had moved out of the sober living home and was "disconnected from her recovery supports." She and O.E. were living in the home of Orlando's father. At a meeting with the Department, Kimberly agreed to participate in family preservation services to avoid having O.E. removed from her again. The Department reported that Orlando was not in compliance with his case plan and was not cooperating with the Department, but that, according to Kimberly, he visited O.E. weekly. At the hearing the juvenile court found Kimberly and Orlando were in partial compliance with their case plans and ordered O.E. to remain placed with Kimberly.

---

[2] "Enhancement services" are "'child welfare services offered to the parent not retaining custody, designed to enhance the child's relationship with that parent.'" (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 212; see *In re A.C.* (2008) 169 Cal.App.4th 636, 642, fn. 5 ["'enhancement' services are 'not designed to reunify the child with that parent, but instead to enhance the child's relationship with that parent by requiring that parent to address the issues that brought the child before the court'"].)

In July 2020 (after the juvenile court continued a second section 364 review hearing) the Department filed a supplemental petition under section 387, asking the court to place O.E. with a foster caregiver. The Department alleged Kimberly was incapable of providing regular care and supervision of O.E. because, among other things, she was currently abusing marijuana, methamphetamine, and alcohol; was not participating in a drug program with weekly testing, as ordered by the court; and in June 2020 was arrested for bringing controlled substances into a prison, in violation of Penal Code section 4573.

The Department reported that on June 29, 2020 Orlando's father informed the Department that law enforcement had executed a search warrant at his home that morning and arrested Kimberly. The search warrant was for methamphetamine and related paraphernalia. O.E. was not with Kimberly at the time, but with his previous foster parents, Jessica and Malia R. The Department spoke with Kimberly's roommate, Connie, who said Kimberly had "not been honest" about her drug use and knew "how to manipulate the system," for example by getting high only immediately after her drug tests. Connie stated that Kimberly's drug of choice was methamphetamine and that when Kimberly used drugs she would keep O.E. in the room with her all day and not let him out, though O.E. cried and said, "I want out." Asked about the search warrant and Kimberly's arrest, Connie said Kimberly had been smuggling drugs to Orlando, who was in jail after having been arrested in January 2020 for drug-related offenses. The Department confirmed Kimberly had been arrested for violating Penal Code section 4573.

On July 22, 2020 the juvenile court held a detention hearing on the supplemental petition. Kimberly and Orlando were incarcerated and not present. Finding O.E.'s continued placement with Kimberly would create a substantial risk of detriment to his safety, protection, or physical or emotional well-being, the court detained O.E. from Kimberly and ordered family reunification services for her and Orlando.

D. *The Juvenile Court Sustains the Supplemental Petition and (Again) Removes O.E.*

In a September 2020 jurisdiction and disposition report, the Department indicated O.E. was again living in the home of Jessica and Malia R., where he appeared happy, comfortable, and affectionate toward his caregivers. Kimberly and Orlando remained incarcerated. The Department reported that, in searching the home of Orlando's father, law enforcement found methamphetamine, scales, and baggies, which resulted in Kimberly's arrest. A Los Angeles County Sheriff's Department report reflected that Kimberly admitted smuggling methamphetamine into a jail facility for Orlando. Kimberly was released shortly after her June 29, 2020 arrest, but she was arrested again on July 22, 2020, this time for violating probation conditions related to a previous offense. She was now serving a three-year sentence, with a scheduled release date of (as the Department later reported) October 2021. Orlando was scheduled for release on March 6, 2021.

In March 2021 the juvenile court held a jurisdiction hearing on the supplemental petition and sustained it, finding all allegations true. The court continued the disposition hearing for the Department to file a last minute information regarding

8

Kimberly's and Orlando's progress in their programs. The Department did so, reporting that Kimberly was participating in several programs at her place of incarceration. The Department also reported that, after Orlando was released from incarceration on March 6, 2021, the Department monitored a visit between him and O.E., during which both appeared "very happy." Three days after the visit, Orlando tested positive for amphetamine and methamphetamine.

At the disposition hearing, held later in March 2021, the juvenile court removed O.E. from Kimberly, declined under section 361.5, subdivision (a)(3)(A), to order family reunification services for her or Orlando, and ordered monitored visitation for both parents. The court set the matter for a selection and implementation hearing under section 366.26.

E.     *The Juvenile Court Terminates Kimberly's and Orlando's Parental Rights*

In a July 2021 report for the section 366.26 hearing, the Department indicated O.E. was having weekly monitored visits with Orlando and weekly monitored telephone visits with Kimberly. The Department reported that Orlando's visits with O.E. were "appropriate and productive," with O.E. appearing "happy and comfortable around" Orlando. In the one telephone visit between Kimberly and O.E. the Department described, O.E. appeared reluctant to talk with his mother. When his caregivers prompted him to speak with her on the telephone, he answered, "I don't want to. Do I have to?" When they answered yes, O.E. and Kimberly had a short conversation in which Kimberly "inquired as to his wellbeing." O.E. answered her questions with "yes" or "no" and did not appear "engaged" in the conversation.

9

The Department recommended the court terminate Kimberly's and Orlando's parental rights.

Orlando, for his part, filed a section 388 petition, seeking to have the court return O.E. to his care or, in the alternative, to have the court reinstate Orlando's family reunification services or, as another alternative, to have his visits with O.E. liberalized. Orlando cited, among other things, his completion of parenting classes and a 12-step recovery program, and argued O.E. had "developed a close bond with" him and loved to spend time with him. In an attached declaration, Orlando described his progress in programs relating to parenting and substance abuse and his current weekly visits with O.E. Orlando stated: "Our weekly monitored visits are great and productive. The social worke[r] has observed that my son and I have a strong bond and that we enjoy spending time together. My son demonstrates how much he wants me in his life, as well as how much he looks up to me." Orlando also requested a bonding study for him and O.E., which the juvenile court denied.

On August 31, 2021 the juvenile court held an evidentiary hearing on Orlando's section 388 petition and the hearing under section 366.26. Orlando was present, and Kimberly, who remained incarcerated, appeared telephonically. The court began by addressing the section 388 petition, admitting into evidence, among other items, Orlando's petition and attachments. Orlando testified, summarizing his progress in programs relating to parenting and substance abuse and describing his recent weekly visits with O.E. He testified that at the start of these visits O.E. would smile and run to him, give him a hug, and then remain by him, not letting Orlando out of his sight. During the visits O.E. also invited Orlando to his house and wanted to show him "things

10

in his room." Orlando stated O.E. looked up to him "as a strong male role model." The court denied Orlando's petition.

Turning to the section 366.26 hearing, the juvenile court received into evidence Orlando's section 388 petition and his testimony from the hearing on the petition and heard testimony from Kimberly. Kimberly testified she was scheduled for release on September 12, 2021. She stated that, before she was incarcerated, O.E. lived with her for "about a year and a half." She also testified that, while incarcerated, she visited with O.E. twice each week by telephone and that, during these visits, O.E. would tell her that he loved her and missed her. Counsel for Kimberly and counsel for Orlando argued the court should not terminate their clients' parental rights because of the parental-benefit exception under section 366.26, subdivision (c)(1)(B)(i).

The juvenile court terminated Kimberly's and Orlando's parental rights, finding no exception to adoption applied. The court stated: "The court notes that mother and father's visitation has been seemingly appropriate and pleasant. No issues with the visitation. But the court also finds that, as to father, he has not served a parental role in this minor's life. . . . Since the minor was two months old, when this case started, the father has not been, really, a father to the minor. But the court does note that recently father's visits have been appropriate. But the court cannot find that the father's bond with the child is more than just an emotional bond. The court cannot find that he serves [a] parental role in this child's life."

The juvenile court continued: "As to mother, the court is very concerned with what happened when the child was in the mother's care. Mother had an opportunity, a very great opportunity, to keep the child in her care when child was

11

returned to her. But she squandered that when she diced by bringing narcotics to the father while in custody while the child was in her care. I think that decision is revealing as to how committed she is to the child's welfare."[3]

The juvenile court concluded: "The court cannot find that terminating parental rights would be detrimental to the child, when the child is in a safe home with caregivers that love him and want to give him stability. And the court cannot find that the child would be greatly harmed by terminating parental rights. . . . Court finds that any benefit to the child from the relationship with mother and father is outweighed by the physical and emotional benefit of adoption and stability and permanency of the adoption and that adoption is in the best interests of the child." Kimberly and Orlando timely appealed.[4]

---

[3]    The juvenile court appeared to use the word "diced" to mean "gambled" or "gambled away."

[4]    In addition to appealing from the juvenile court's order terminating his parental rights, Orlando appealed from the order denying his section 388 petition. Because he raises no arguments in his briefs concerning the latter order, however, he has abandoned that aspect of his appeal. (See *In re M.B.* (2022) 80 Cal.App.5th 617, 620, fn. 1.)

# DISCUSSION

A. *The Juvenile Court Erred in Determining Whether the Parental-benefit Exception Under Section 366.26, Subdivision (c)(1)(B)(i), Applied*

1. *Applicable Law and Standard of Review*

"To guide the court in selecting the most suitable permanent arrangement" for a dependent child "who cannot be returned to a parent's care," section 366.26 "lists plans in order of preference and provides a detailed procedure for choosing among them." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 630; see § 366.26, subd. (b); *In re A.L.* (2022) 73 Cal.App.5th 1131, 1149.) If the court finds that the child "is likely to be adopted" and that "there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption." (*Caden C.*, at p. 630; see § 366.26, subd. (c)(1); *In re Katherine J.* (2022) 75 Cal.App.5th 303, 316.) "But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, at pp. 630-631; see § 366.26, subd. (c)(1)(B)(i)-(vi), (4)(A); *In re B.D.* (2021) 66 Cal.App.5th 1218, 1225.)

One of those reasons, the parental-benefit exception, requires the parent to establish by a preponderance of the evidence (1) "the parent has regularly visited with the child," (2) "the child would benefit from continuing the relationship," and (3) "terminating the relationship would be detrimental to the child." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 629; see § 366.26,

13

subd. (c)(1)(B)(i); *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 206.) "The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, at p. 632; see *In re Katherine J.*, *supra*, 75 Cal.App.5th at p. 316.)

To establish the second element, that the child would benefit from continuing the parental relationship, the parent must show the child has a "substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 636; see *In re J.D.* (2021) 70 Cal.App.5th 833, 854.)  The "focus is the child," and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, at p. 632; see *J.D.*, at p. 854.)  "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, at p. 632; see *J.D.*, at p. 854.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 633; see *In re Katherine J.*, *supra,* 75 Cal.App.5th at p. 317.)  "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s) . . . .  Accordingly, courts should not look to whether the parent can provide a home for the child." (*Caden C.*,

14

at p. 634; see *Katherine J.*, at p. 317.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child due to' the child's beneficial relationship with a parent." (*Caden C.*, at pp. 633-634; see *Katherine J.*, at p. 317.)

A "substantial evidence standard of review applies to the first two elements. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 639-640; see *In re Katherine J.*, *supra*, 75 Cal.App.5th at p. 317; *In re L.A.-O.*, *supra*, 73 Cal.App.5th at p. 206.)

"The third element—whether termination of parental rights would be detrimental to the child—is somewhat different. As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. . . . [¶] Yet the court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. . . . The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 640; see *In re Katherine J.*, *supra*,

15

75 Cal.App.5th at p. 318; *In re L.A.-O., supra*, 73 Cal.App.5th at p. 206.)

2. *The Juvenile Court Failed To Consider the Second Element of the* In re Caden C. *Analysis*

The first element of the parental-benefit exception identified in *In re Caden C.*—that the parent regularly visited with the child—is not in dispute; the juvenile court appears to have ruled Kimberly and Orlando met their burden on that element. What the parties dispute is whether the court properly analyzed the second element: that the child would benefit from continuing the parental relationship. And we agree with Kimberly and Orlando the court erred in analyzing that element. More accurately: The court skipped the second-element analysis for Kimberly, and to the extent it conducted the analysis for Orlando, the court's analysis was not consistent with *In re Caden C.*

As the Supreme Court in *Caden C.* emphasized, "when examining whether the parent-child relationship exception applies it is critical for the juvenile court at the second step of the analysis to consider the evidence showing whether the parent's actions or inactions 'continued or developed a significant, positive, emotional attachment from child to parent.'" (*In re B.D., supra*, 66 Cal.App.5th at p. 1230.) And evaluating whether such an attachment existed between the parent and the child is, in turn, "crucial to the third step of the analysis, weighing the harm of severing the natural parent/child relationship to the benefits of a new adoptive home." (*Id.* at p. 1228.)

Here, the juvenile court's statements at the selection and implementation hearing under section 366.26 suggest the court

16

wholly neglected to examine the nature of the relationship between Kimberly and O.E., as required in the second step of the analysis prescribed by *In re Caden C.* The court made no comment whatsoever on the existence or nature of O.E.'s attachment to Kimberly. Instead, the court expressed concern about Kimberly's smuggling drugs to Orlando, which the court suggested reflected her lack of commitment to O.E.'s welfare. But even assuming that suggestion was well taken, it established nothing about O.E.'s attachment to Kimberly. (See *In re D.M.* (2021) 71 Cal.App.5th 261, 270 [the Supreme Court in *In re Caden C.* "made clear the beneficial relationship exception is not focused on a parent's ability to care for a child"].)

Similarly, the juvenile court did not properly examine O.E.'s attachment to Orlando. Again, the court made no comment on the existence or nature of such an attachment. Rather, without indicating what it meant by the phrase, the court found Orlando had not "served a parental role" in O.E.'s life. "Unfortunately, the words 'parental role' standing alone, can have several different meanings. . . . [¶] They can mean being a *good* parent—nurturing, supportive, and guiding. *Caden C.*, however, tells us that the parental-benefit exception does not require being a good parent . . . ." (*In re L.A.-O., supra,* 73 Cal.App.5th at p. 210; see *In re Caden C., supra,* 11 Cal.5th at p. 634; *In re Katherine J., supra,* 75 Cal.App.5th at p. 319 [*In re Caden C.* "requires juvenile courts to do more than summarily state that a parent has not occupied a parental role in his child's life"]; *In re D.M., supra,* 71 Cal.App.5th at p. 270 [juvenile court's decision that parental-benefit exception did not apply was based on improper factors where, "[w]hile focusing on whether father occupied a 'parental role' in the children's lives, . . . the court said

17

nothing about the attachment between father and his children"].) The court's comment that Orlando's bond with O.E. was "just an emotional bond" further suggests the court did not apply the proper legal standard: It is precisely a substantial and positive "emotional attachment to the parent" (*In re Caden C.*, at p. 636) that a court must look for.

Thus, the juvenile court did not apply the correct legal standard, as set forth in *In re Caden C.,* when the court evaluated (or failed to evaluate) the second element of the parental-benefit exception. In some cases, such an error might be harmless: "[W]hen a juvenile court applies the wrong legal standard in rejecting the beneficial relationship exception, reversal is not warranted if the parent did not introduce evidence that would permit a finding in their favor under the correct legal standard." (*In re J.R.* (Aug. 22, 2022, A164334) __ Cal.App.5th __, __ [2022 WL 3582652, at p. 1].) But not here.

The record shows that, at various points in the case, the Department observed O.E. had developed "a healthy attachment" to, "a strong bond" with, and "a strong attachment" to Kimberly. Kimberly testified at the section 366.26 hearing that, at the conclusion of her telephone visits with O.E. while she was incarcerated, O.E. would say, "I love you. I miss you." (See *In re Caden C., supra,* 11 Cal.5th at p. 632 ["courts often consider how children feel about, interact with, look to, or talk about their parents"].) Similarly, at the section 366.26 hearing, Orlando testified that, during his visits with O.E., O.E. greeted him enthusiastically and wanted Orlando to come to his house and that O.E. looked to him as a role model. Orlando also presented evidence a social worker had observed that he and O.E. had "a strong bond" and that O.E. demonstrated he wanted Orlando in

18

his life.[5]  Given this evidence, the juvenile court's error in analyzing the second element of the parental-benefit exception was not harmless.

Nor was the juvenile court's error harmless because the court recited, in conclusory fashion, that "*any* benefit to the child from the relationship with mother and father is outweighed by the physical and emotional benefit of adoption and stability and permanency of the adoption."  (Italics added.)  As the Supreme Court explained in *In re Caden C.*, a determination on the third element of the parental-benefit exception rests on "a series of factual determinations" and requires "a delicate balancing of these determinations," "weighing the harm of losing the [parental] relationship against the benefits of placement in a new, adoptive home."  (*In re Caden C.*, *supra*, 11 Cal.5th at p. 640.)  A court cannot accurately weigh the harm to a child of losing a parental relationship without first evaluating the nature of that relationship—in particular, the nature of the child's attachment, if any, to the parent.

---

[5]     As stated, Orlando requested—and the juvenile court denied—a bonding study.  Orlando does not argue the court erred in denying his request.  As the Supreme Court observed, however, "often expert psychologists who have observed the child and parent and can synthesize others' observations will be an important source of information about the psychological importance of the relationship for the child."  (*In re Caden, supra*, 11 Cal.5th at pp. 632-633.)  Consequently, "[t]rial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony."  (*Id.* at p. 633, fn. 4.)

B.  *The Juvenile Court and the Department Failed To Comply with the Inquiry Requirements Under ICWA and Related California Law*

ICWA provides that, "where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe . . . of the pending proceedings and of their right of intervention."[6]  (25 U.S.C. § 1912(a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 5; *In re J.C.* (2022) 77 Cal.App.5th 70, 76.) "This notice requirement, which is also codified in California law [citation], enables a tribe to determine whether the child is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the proceeding." (*Isaiah W.*, at p. 5; see § 224.3; *In re Y.W.* (2021) 70 Cal.App.5th 542, 551; *In re T.G.* (2020) 58 Cal.App.5th 275, 288.)

"[J]ust as proper notice to Indian tribes is central to effectuating ICWA's purpose, an adequate investigation of a family member's belief a child may have Indian ancestry is essential to ensuring a tribe entitled to ICWA notice will receive it." (*In re T.G.*, *supra*, 58 Cal.App.5th at p. 289.)  Section 224.2, subdivision (a), provides that courts and child protective agencies "'have an affirmative and continuing duty to inquire whether a

---

[6]  "'ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."'" (*In re H.V.* (2022) 75 Cal.App.5th 433, 437; see 25 U.S.C. § 1903(4); § 224.1, subd. (a).)

child for whom a petition under Section 300 . . . is to be, or has been, filed is or may be an Indian child.'"[7] (See *In re Isaiah W.*, *supra*, 1 Cal.5th at p. 9; *In re H.V.* (2022) 75 Cal.App.5th 433, 437.) Section 224.2, subdivision (b), requires the child protective agency to ask the child, parents, legal guardian, and "extended family members," among others, "whether the child is, or may be, an Indian child." (*In re J.C.*, *supra*, 77 Cal.App.5th at p. 77; see *In re Antonio R.* (2022) 76 Cal.App.5th 421, 429-430; *In re Y.W.*, *supra*, 70 Cal.App.5th at p. 552; Cal. Rules of Court, rule 5.481(a)(1).) "Thus, a juvenile court errs in making a finding ICWA does not apply to the proceedings without first ensuring that the Department has made an adequate inquiry under ICWA and California law, and if necessary, the court must continue the proceedings and order the Department to fulfill its responsibilities." (*Antonio R.*, at p. 431; see § 224.2, subd. (i)(2).)

The record reflects that early in this case Kimberly and Orlando reported to the Department and the juvenile court that neither they nor O.E. had any Indian ancestry.[8] Thereafter, at the August 2017 detention hearing, the juvenile court found it did not have a reason to know O.E. was an Indian child. In August 2021, at the section 366.26 hearing, the court found it had no

---

[7] Federal regulations implementing ICWA also require the court to ""ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child"" and to ""instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child."" (*In re Y.W.*, *supra*, 70 Cal.App.5th at p. 551; see 25 C.F.R. § 23.107(a).)

[8] They also denied having "any Native American Heritage."

reason to believe O.E. was an Indian child and no reason to know ICWA applied.

But Kimberly and Orlando contend, the Department concedes, and we agree the Department did not comply with its duty of inquiry because it failed to ask known and readily available members of O.E.'s extended family about whether O.E. was or might be an Indian child.  Those family members include O.E.'s paternal grandfather, a paternal aunt, and two maternal aunts.  Therefore, the juvenile court erred in finding ICWA did not apply, and we direct the court to ensure the Department conducts a proper inquiry.  (See *In re J.C.*, *supra*, 77 Cal.App.5th at p. 74; *In re Antonio R.*, *supra*, 76 Cal.App.5th at p. 426.)

## DISPOSITION

The juvenile court's orders terminating Kimberly's and Orlando's parental rights under section 366.26 are reversed.  The juvenile court is directed to conduct a new section 366.26 hearing and a proper analysis of the parental-benefit exception consistent with *In re Caden C.*, *supra*, 11 Cal.5th 614.  The juvenile court is also directed to ensure the Department complies fully with the inquiry and, if necessary, notice provisions of ICWA and related California law.

SEGAL, J.

We concur:

PERLUSS, P. J.          FEUER, J.

22